**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-4598 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| KHALEEL AHMED, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff United States of America brings this action to revoke Defendant Khaleel Ahmed's citizenship and cancel his certificate of naturalization. Currently pending before the Court is Plaintiff's motion for judgment on the pleadings on Counts 2, 3, and 5 [88]. For the reasons stated below, the Court grants Plaintiff's motion [88] on all three counts. Given that this opinion quotes a 2009 plea agreement that, as far as the Court can discern, may remain under seal, this opinion will be at least temporarily sealed to allow counsel time to determine which portions of the opinion may need to be redacted in a public version. This case is set for a telephonic status hearing on October 6, 2021 at 9:00 a.m. to discuss (a) how Plaintiff intends to deal with the remaining counts in its complaint, (b) whether entry of a final judgment is appropriate, (c) what form any such judgment should take, and (d) what portions of this opinion, if any, should be redacted if the 2009 plea agreement remains sealed. See *United States v. Valenzuela*, 2018 WL 3619503, at *4 n.4, *9 (N.D. Ill. Jul. 29, 2018). If Plaintiff agrees that the remaining counts are moot and believes that entry of a final judgment is appropriate, Plaintiff should transmit to counsel for Defendant and email to the Court's Proposed Order Box a draft proposed final judgment order no later than October 4, 2021. See *United States v. Valenzuela*, Case No. 17-cv-8423, Docket Entry 27 (N.D.

Ill. Aug. 15, 2018). Counsel also should meet and confer in advance of the October 6 status hearing on any redactions that either side would request.

## I.  Background

### A.  Factual Background

Defendant Khaleel Ahmed, a native of India [58 at ¶ 5], has been living in the United States since August 1998 when he was admitted as a permanent resident. [*Id.* at ¶ 7.] On June 16, 2003, Defendant applied for naturalization by submitting a Form N-400 to the United States Citizenship and Immigration Services ("USCIS"). [*Id.* at ¶ 8; 1-2 at 2.]

The application presents a series of yes-or-no questions, several of which are relevant to the instant case. Specifically, one of the questions asked: "Have you ever been a member of or in any way associated (either directly or indirectly) with a terrorist organization?" [1-2 at 8.] Defendant checked the box stating "No." [*Id.*] Another question asked: "Have you ever committed a crime or offense for which you were not arrested?" [*Id.* at 9.] Defendant again checked the box indicating "No." [*Id.*] Defendant signed the final page of the application to "certify, under penalty of perjury under the laws of the United States of America, that this application, and the evidence submitted with it, are all true and correct." [*Id.* at 11.]

On March 4, 2004, Defendant sat for an interview with a USCIS examiner. [58 at ¶ 13.] At the start of the interview, Defendant swore under oath that he would answer all questions truthfully [*id.* at ¶ 14], and once the interview was over, he signed his Form N-400 for a second time to certify that he had done so. [1-2 at 11.] The USCIS examiner asked many of the same questions contained in the written application, including whether Defendant had ever been affiliated with a terrorist organization, and whether he had ever committed a crime for which he had not been arrested. [58 at ¶¶ 15–16.] Defendant answered "no" to both questions. [*Id.*] USCIS

2

approved Defendant's application that same day. [*Id.* at ¶ 19.] On March 31, 2004, Defendant took the oath of allegiance to the United States and was issued a certificate of naturalization. [*Id.*]

Approximately three years later, on February 7, 2007, Defendant was indicted in the United States District Court for the Northern District of Ohio for conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country in violation of 18 U.S.C. § 956. [*Id.* at ¶ 21.] Defendant was arrested on February 21, 2007. [*Id.*] Defendant was indicted again in December 2007 for providing material support to terrorists in violation of 18 U.S.C. § 2339A. [*Id.* at ¶ 22.] The court dismissed the initial indictment later that month. [*Id.*]

On January 15, 2009, the United States Attorney's Office for the Northern District of Ohio ("USAO") filed a superseding information charging Defendant with providing material support to terrorists—specifically, knowingly providing material support to a conspiracy to kill and maim members of the U.S. military serving in Iraq and Afghanistan—in violation of 18 U.S.C. § 2339A. [*Id.* at ¶ 23; 1-3.] Pursuant to a written agreement and with the assistance of counsel, Defendant pled guilty to the sole count in the information. [58 at ¶ 24; 14.] In so pleading, he admitted that most of his criminal conduct took place after he was naturalized. But he also admitted that at least one component of the crime took place before he obtained citizenship. Specifically, he acknowledged that "[f]rom a date unknown, but no later than January 1, 2004," he "committed using code words and spoke in a foreign language in order to disguise" certain "preparations and plans to engage in acts outside the United States which would result in the murder or maiming of U.S. military forces in Iraq and Afghanistan." [1-4 at 50.] The court accepted Defendant's guilty plea [58 at ¶ 24; 1-4] and sentenced him to 100 months in prison [1-1 at 5.]

### B. Procedural Background

Nine years later, on July 3, 2018, the government filed this action under Section 340(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1451(a), to revoke Defendant's citizenship. The complaint alleges that Defendant was statutorily ineligible to obtain citizenship, and his citizenship should therefore be revoked on five independent grounds. In the instant motion, the government moves for judgment on the pleadings on three of those counts: (1) Defendant illegally procured citizenship because he could not satisfy the good moral character requirement for naturalization because he committed a crime involving moral turpitude (Count 2); (2) Defendant illegally procured citizenship because he could not satisfy the good moral character requirement because he committed unlawful acts that reflect adversely on his moral character (Count 3); and (3) Defendant procured citizenship by concealment or a material fact or by willful misrepresentation (Count 5). The government contends [see 88, at 3], and Defendant does not contest, that each of these grounds, if established on the basis of the pleadings, is an independent basis on which the Court can grant the motion and revoke Defendant's naturalization.

## II. Legal Standard

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Pleadings "include the complaint, the answer, and any written instruments attached as exhibits." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (citing Fed. R. Civ. P. 12(c)). "The only difference between a motion for judgment on the pleadings and a motion to dismiss is timing; the standard is the same." *Federated Mutual Ins. Co. v. Coyle Mechanical Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020). "When a plaintiff moves for judgment on the pleadings, the motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove

facts sufficient to support its position, and that the plaintiff is entitled to relief." *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020). "Thus to succeed, the moving party must demonstrate that there are no material issues of fact to be resolved." *N. Ind. Gun & Outdoor Shows*, 163 F.3d at 452. "As with a motion to dismiss, the court views all facts and inferences in the light most favorable to the non-moving party." *Federated Mutual Ins.*, 983 F.3d at 313 (quoting *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993)).

## III.    Analysis

Under section 340(a) of the INA, the government may revoke its grant of citizenship "on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). But denaturalization is a "drastic measure," *Schneider v. Rusk*, 377 U.S. 163, 168 (1964), and the government therefore "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Costello v. United States*, 365 U.S. 265, 269 (1961). Thus, to prevail an action to revoke naturalization, the government must present "clear, unequivocal, and convincing" evidence justifying revocation. *Fedorenko*, 449 U.S. at 505 (quoting *Schneiderman v. United States*, 320 U.S. 118, 125 (1887)). If the government meets this heavy burden, the Court lacks discretion to refrain from entering a judgment of denaturalization against the Defendant. See *id.* at 517.

### A.  Illegal Procurement – Lack of Good Moral Character

Under 8 U.S.C. § 1451(a), citizenship is "illegally procured" when it is procured by a person who was statutorily ineligible for citizenship. See *Fedorenko*, 449 U.S. at 506. One requirement for naturalization is that the applicant demonstrate that he "has been and still is a person of good moral character" during the five years leading up to his application, and until he is

issued a Certificate of Naturalization—the "statutory period." 8 U.S.C. § 1427(a); 8 C.F.R. § 316.10(a). Defendant applied for naturalization on June 16, 2003 and took the oath of citizenship on March 31, 2004. The statutory period in this case therefore is from June 16, 1998 through March 31, 2004.

The INA does not define good moral character, but it does provide a non-exhaustive list of criteria that preclude a naturalization applicant from establishing good moral character. See 8 U.S.C. § 1101(f); see also *United States v. Suarez*, 2010 WL 3418281 (N.D. Ill. Aug. 27, 2010) ("While the [INA] does not specifically define what 'good moral character' is, it quite clearly states what it is not."). Among those categories which preclude an individual from having good moral character are a person who, during the statutory period, has committed a crime involving moral turpitude, 8 U.S.C. §§ 1101(f)(3), or committed unlawful acts "that adversely reflect upon the applicant's moral character," 8 U.S.C. § 1101(f).

### 1. Crime Involving Moral Turpitude (Count 2)

The government first asserts that it is entitled to judgment on the pleadings on Count 2, in which it alleges Defendant illegally procured citizenship because he committed a crime involving moral turpitude during the statutory period in which he needed to possess good moral character. A crime involving moral turpitude refers to "conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *United States v. Valenzuela*, 931 F.3d 605, 608 (7th Cir. 2019) (quotations omitted). Whether a defendant's crime involves moral turpitude is a question of law. See *Lagunas-Salgado v. Holder*, 584 F.3d 707, 710 (7th Cir. 2009).

It is undisputed that Ahmed pled guilty to and was convicted of providing material support and resources for terrorism in violation of 18 U.S.C. § 2339A, including "knowing and intending

the material support and resources were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956 (conspiracy to kill and maim individuals outside the United States)." [14 at 7.] Defendant's crime involves moral turpitude—he knowingly and intentionally aided an operation to kill and maim U.S. soldiers abroad. Conduct of this nature undoubtedly constitutes a crime *malum in se*. See *malum in se*, Black's Law Dictionary (11th ed. 2019) (defining a crime *malum in se* as one that is "inherently immoral, such as murder, arson, or rape"). The crime therefore involves moral turpitude. See *Arias v. Lynch*, 834 F.3d 823, 827 (7th Cir. 2016) ("[C]rimes that are *malum in se* (inherently wrong), as opposed to *malum prohibitum* (wrong only because prohibited), are often said to involve moral turpitude.").

It is also undisputed that Defendant committed at least one component of his crime during the statutory period, as he admitted having communicated in code to conceal plans to engage in acts of terrorism "[f]rom a date unknown, but no later than January 1, 2004." [14 at 8.] Though lacking a precise date, this conduct necessarily falls within the statutory period. Based on the record before the Court, Defendant's time in the United States began in August 1998 when he was admitted as a permanent resident [58 at ¶ 7.] Because Defendant's statutory period began two months prior, in June 1998, Defendant does not contest the fact that at least some of his criminal conduct falls within the statutory period. Nothing about the statutory period thus precludes the Court from entering judgment on the pleadings. *Cf. United States v. Arnaout*, 2015 WL 12826475 (N.D. Ill. Aug. 26, 2015) (denying the government's motion for judgment on the pleadings where the defendant argued that his plea agreement did not definitively confirm when he joined the conspiracy upon which the government based its denaturalization action).

### 2. Unlawful Acts (Count 3)

The government next argues that even if providing material support to terrorists is not a crime of moral turpitude, he nonetheless lacked good moral character under the "catch-all" provision of the INA, which provides that "[t]he fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." 8 U.S.C. § 1101(f). Under this provision, an applicant "shall be found to lack good moral character if, during the statutory period, the applicant * * * [c]ommitted acts that adversely reflect upon the applicant's moral character" unless "the applicant establishes extenuating circumstances." 8 C.F.R. § 316.10(b)(3).

The Court first notes in light of its determination with respect to Count 2 that Defendant's crime is one of moral turpitude, Count 3 is easily resolved. It is undisputed that Defendant committed unlawful acts in violation of 18 U.S.C. § 2339A, and because the crime involves moral turpitude, those acts adversely reflect upon the Defendant's character. See *United States v. Salem*, 496 F. Supp. 3d 1167, 1177 (N.D. Ill. 2020) ("He was convicted of crimes of moral turpitude, which reflect poorly on his moral character."); see also *United States v. Al-Aqaili*, 550 F. App'x 356, 357 (8th Cir. 2014) ("Acts involving moral turpitude * * * adversely reflect upon the applicant's moral character." (citations omitted)).

But even if the Court had not already determined that Defendant's crime involved moral turpitude, other undisputed facts in the record show that Defendant's unlawful acts adversely reflect upon his moral character. In particular, as the government points out, all naturalization applicants must take an Oath of Allegiance to the United States before being admitted as a citizen. See 8 U.S.C. § 1448(a). Every person who is granted citizenship—Defendant included—has thus sworn to "support and defend the Constitution and the laws of the United States against all

enemies, foreign and domestic." *Id.* It follows, then, that a person who commits unlawful acts directly in support of enemies of the United States engages in conduct that adversely reflects on his moral character.

Nowhere in the pleadings does the Defendant attempt to establish extenuating circumstances that would render his crime "less reprehensible than it otherwise would be." *United States v. Suarez*, 664 F.3d 655, 662 (7th Cir. 2011). The pleadings therefore demonstrate that the Defendant committed such unlawful acts during the statutory period to preclude him from establishing the requisite good moral character to obtain citizenship.

### B. Willful Misrepresentation (Count 5)

In Count 5, the government seeks to revoke Defendant's citizenship on the grounds that he concealed or willfully misrepresented material facts in order to obtain naturalization. See 8 U.S.C. § 1451(a). This provision gives the government grounds to revoke the Defendant's citizenship if four elements are met: (1) "the naturalized citizen must have misrepresented or concealed some fact," (2) "the misrepresentation or concealment must have been willful," (3) "the fact must have been material," and (4) "the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." *Kungys v. United States*, 485 U.S. 759, 767 (1988). The undisputed facts in this case satisfy all four elements.

First, there is no question that the Defendant misrepresented and concealed facts. On March 4, 2004, Defendant interviewed with a USCIS examiner in connection with his naturalization application and swore under oath that he had never been associated with a terrorist organization, nor had he ever committed a crime for which he had not been arrested. [58 at ¶¶ 15–16.] When Defendant pled guilty, however, he admitted that he had committed certain criminal acts "no later

than January 1, 2004." The pleadings thus demonstrate that Defendant misrepresented facts under oath at least once in the process of applying for citizenship.

Second, Defendant's misrepresentation was willful. "Proof that an alien knew his representation to be false suffices to establish willfulness." *Ascentic v. Sessions*, 874 F.3d 974, 981 (7th Cir. 2017). After having already procured citizenship, Defendant admitted that he committed certain criminal acts in connection with his offense "no later than January 1, 2004." Defendant further acknowledged during his plea colloquy that he was aware when committing such acts that his conduct violated American law. [1-4 at 51:19–23.] He did not, however, disclose these criminal activities to the USCIS agent who conducted his naturalization interview on March 4, 2004. He thus deliberately concealed his criminal conduct at the time of his March 2004 naturalization interview, and intentionally misrepresented that he had never committed a crime for which he had not been arrested.

Third, Defendant's misrepresentations were material. Whether Defendant's falsehoods were material is determined by "whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service," which is a question of law. *Kungys*, 485 U.S. at 772. As discussed in detail above, the conduct that Defendant committed during the statutory period made him ineligible to establish good moral character, thus rendering him statutorily ineligible to procure citizenship. This alone demonstrates that the misrepresentations were material. See *Maslenjak v. United States*, 137 S. Ct. 1918, 1928 (2017) (noting that when "the facts the defendant misrepresented are themselves disqualifying **** there is an obvious causal link between the defendant's lie and her procurement of citizenship"). It similarly proves that the fourth and final *Kungys* factor is met in this case: Defendant procured naturalization based on his misrepresentation. The "procurement" element asks only whether it was "fair to infer that the

citizen was actually ineligible" to naturalize. See *United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009) (quoting *Kungys*, 485 U.S. at 784 (Brennan J., concurring)). Here, where the concealed fact would have revealed Defendant's participation in a crime involving moral turpitude, it is not only "fair to infer" that he was ineligible for citizenship, but is the only conclusion possible based on Defendant's admitted conduct.

### C. Defendant's Arguments

Defendant raises three affirmative defenses which he claims raise material issues of fact that cannot be resolved on the pleadings.[1] The Court disagrees.

#### 1. Contract Breach

Defendant's first affirmative defense sounds in contract law. He argues that under the terms of his plea agreement, the government may not bring a denaturalization action against him. He primarily relies on paragraph 18 of the plea agreement, ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ In Defendant's view, the government "implicitly waived" the right to bring a denaturalization action against him ███████████████████████. Thus, he maintains, additional discovery is required in this action for the parties to "evaluate the

---

[1] The government urges the Court to discredit Defendant's arguments with respect to his affirmative defenses where the arguments "diverge[] so substantively from the focus of the defense[s] he affirmatively pled in his Answer." [92 at 6–7.] In so arguing, the government points to only minor differences in the way Defendant articulates his defense in his Answer compared to his brief in response to the government's motion for judgment on the pleadings. More importantly, however, even if Defendant argued a materially different affirmative defense in his brief in the instant motion, "failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it, and there was no harm here." *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003) (citations omitted).

representations made to Defendant, or his counsel, at the time of the negotiation and execution of the plea agreement." [91 at 9.]

Because the plea agreement is a contract, its meaning is determined "according to ordinary contract principles." *United States v. Hallahan*, 756 F.3d 962, 971, 974 (7th Cir. 2014). The Court thus interprets the agreement "according to its plain meaning" unless the agreement is ambiguous. *Id.* at 974. The Court will not consider information outside of the four corners of the contract— such as the negotiation process—if the agreement is unambiguous on its face. *Id.*

Here, Defendant's plea agreement is unambiguous. His argument that additional discovery is required for the parties to assess the plea negotiation process thus fails as a matter of law. First, paragraph 18, the provision upon which Defendant relies, does not prevent the government from instituting a civil denaturalization action against him. Where paragraph 18 ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

The limited scope of ████████████████ is further clarified by other provisions of the plea agreement. Specifically, Defendant acknowledged that the plea agreement ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ He further testified during his plea colloquy that he understood that "the government's agreement is limited to the United States Attorney's Office in the Northern District of Ohio, and is not binding on any other jurisdiction" other than the counter-terrorism section of the Department of Justice. [1-4 at 57–58.] Defendant also acknowledged that the plea agreement ████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████ Taken together, the plea agreement as a whole, and Defendant's certifications that he understood the terms of the agreement, do not leave open any dispute requiring additional discovery. Nothing about Defendant's first affirmative defense therefore precludes the Court from entering judgment on the pleadings on any of the counts against him.

### 2. Collateral Estoppel

In his second affirmative defense, Defendant contests the use of his guilty plea and criminal conviction as the factual basis for denaturalization. Relying on *Padilla v. Kentucky*, 559 U.S. 356 (2010), he argues that he was deprived of his constitutional right to effective counsel during his criminal proceedings, because neither defense counsel nor prosecution apprised him at the time of the potential immigration consequences of pleading guilty. Thus, Defendant contends, because he "received ineffective assistance of counsel during the Criminal Action" [91 at 8], his guilty plea lacks preclusive effect, and the government may not now use his criminal conviction against him in this civil proceeding. He further argues, with respect to the instant motion, that judgment on the pleadings at this time is improper because this affirmative defense "requires further discovery regarding whether Defendant's counsel apprised him of the consequences of a guilty plea on his immigration status." [*Id.* at 9.]

This affirmative defense also fails as a matter of law. It is well established that Defendant may not challenge his underlying criminal conviction in a civil denaturalization action. See *Suarez*, 664 F.3d at 663; see also *United States v. Salem*, 498 F. Supp. 3d 1167, 1181 (N.D. Ill. 2020) ("[Defendant] cannot challenge his criminal conviction through the back door in a denaturalization proceeding."); *United States v. Valenzuela*, 2018 WL 3619503, at *6 (N.D. Ill. July 29, 2018)

(holding that where a state court entered a final judgment based on the Defendant's guilty plea, "the judgment is binding on [the defendant], and the government is entitled to rely on it **** [the defendant] may not collaterally attack the judgment" in the civil denaturalization action). The Court need not decide here whether Defendant has a valid challenge to his conviction based on *Padilla*. What matters is that Defendant has not collaterally challenged his criminal conviction— nor does he intend to [91 at 11 n.5]—and cannot do so here. See *Salem*, 496 F. Supp. 3d at 1183 ("A denaturalization case is not the right time or place to challenge a criminal conviction." (citing *Suarez*, 664 F.3d at 663)).

### 3. Statute of Limitations

Finally, Defendant argues for the first time in his response brief that the government's action is untimely. [91 at 12.] Although Defendant should have raised this defense in his answer to the government's complaint, see *United States v. Adent*, 821 F.3d 911, 914 (7th Cir. 2016), the Court addresses the argument briefly as it proves no more useful for the defendant. See *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003) ("[F]ailure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it, and there was no harm here." (citations omitted)).

The Court is not aware of any Seventh Circuit cases addressing this precise issue, but every circuit that has addressed the question of whether the general federal statute of limitations applies to civil denaturalization actions has answered the question in the negative. See, *e.g.*, *United States v. Phattey*, 943 F.3d 1277 (9th Cir. 2019) ("Because the purpose of denaturalization is to remedy a past fraud by taking back a benefit to which an alien is not entitled, we conclude it is not a penalty, and the statute of limitations does not apply."); *United States v. Mandycz*, 447 F.3d 951 (6th Cir. 2006) ("Because the United States acted in its sovereign capacity when it sought to

14

denaturalize Mandycz, the common law doctrine of laches does not apply."); *see also Salem*, 496 F. Supp. 3d at 1182 ("The federal government does not lose power over its borders through the passage of time."). This argument therefore also fails because the government was not bound by any statute of limitations.

## IV.    Conclusion

For the reasons stated above, Plaintiff's motion for judgment on the pleadings [88] is granted on Counts 2, 3, and 5. Given that this opinion quotes a 2009 plea agreement that, as far as the Court can discern, may remain under seal, this opinion will be at least temporarily sealed to allow counsel time to determine which portions of the opinion may need to be redacted in a public version. This case is set for a telephonic status hearing on October 6, 2021 at 9:00 a.m. to discuss (a) how Plaintiff intends to deal with the remaining counts in its complaint, (b) whether entry of a final judgment is appropriate, (c) what form any such judgment should take, and (d) what portions of this opinion, if any, should be redacted if the 2009 plea agreement remains sealed. *See United States v. Valenzuela*, 2018 WL 3619503, at *4 n.4, *9 (N.D. Ill. Jul. 29, 2018). If Plaintiff agrees that the remaining counts are moot and believes that entry of a final judgment is appropriate, Plaintiff should transmit to counsel for Defendant and email to the Court's Proposed Order Box a draft proposed final judgment order no later than October 4, 2021. *See United States v. Valenzuela*, Case No. 17-cv-8423, Docket Entry 27 (N.D. Ill. Aug. 15, 2018). Counsel also should meet and confer in advance of the October 6 status hearing on any redactions that either side would request.

Dated: September 22, 2021

Robert M. Dow, Jr.
United States District Judge